We'll move on to our next case, which is Illinois Transportation v. Chicago. Mr. Shachtman. Good morning. I'm pleased to be here. I'm pleased to represent the Chicago Taxis and the Chicago Libraries. Before I get too deeply into the quite interesting issues in this case, there's an important point I want to make that will take about a minute. And it's this, and it's one of those points that I think has legal technicalities associated with it, but the point itself is simple and straightforward. And that is what the city has done to the taxis, and to a similar but lesser extent to the liveries, is grossly unfair. For 80 years, the city of Chicago required anyone who wanted to operate a taxi to comply with the city's medallion system. The medallion system was not your conventional police power regulation. Frankly, it was something unique. It was a hybrid of a public utility type regulation and a revenue generating activity for the city. It was like a public utility because the city told the medallion owners what equipment to use, what lease rates to set for their taxis if they leased them, what lease rates to set for their medallion if they leased the medallion, what driver standards to apply. They set every detail of taxi operation, and they set the fares. They said, this is how much you can charge, no more, no less. And the city itself sold medallions, and it sold them at high prices, and in addition collected a 5% transfer fee whenever a medallion transferred. So the city treated medallions like property. The plaintiffs, the people who bought medallions, relied on the system that the city created. Medallions were bought, they were sold, they were financed, they were refinanced, they were secured, just like real property, just like real estate. Then, starting in 2012, the city destroyed the central right of the medallion system, and that was the right of exclusivity, granted by statute, to operate a service that provided private transportation. Is there any difference between this case and the one we just heard? Lots of differences. Pardon? Many. Well, what's one? One is that the city itself generated the investment-based expectations by itself promoting the sale of medallions and profiting from the sale. It did that over and over and over again, and in the process, at the last group of medallions it offered in October of 2013, it offered 50 for $360,000 minimum bid each. And the prior auctions, there had been one in 2012, there had been one in 2006, were at similar prices. The 2012 auction went at $257,000 to $259,000. It was an auction, people came in and bid in those prices. Let me ask you, Mr. Shackman, before you go a little further, you're not arguing that the city is bound to a particular number of medallions, are you? No, I'm not. So if the city had said there could be, rather than this Lyft-Uber situation, there could be, say, a thousand medallions, that would certainly decrease the value of medallion holders, right? If the question is could the city issue another thousand medallions, the answer to that question depends on which rule of law you want to apply. The taking question requires you to look at Penn Central, and Penn Central says you have to look at reasonable investment-based expectations, the nature of the government activity, and the effect on the claimant. Now, you'd have to analyze the thousand against those three standards. What we say in our brief and what the facts are is that over 60 years, going back to 1937, the average rate of increase in medallions has been 35 per year. So we would say that an order of magnitude of 35 or 50 a year, that kind of increase would be consistent with the expectations of people who invested in the medallion system and played by the city's rules. A thousand would not sound to me to be in that order of magnitude. So my answer would be no, the city couldn't have done that. But my other answer would be the city didn't do that. The city didn't exercise whatever discretion and right it had, and it has the power of a legislative body to make changes in the law. We don't dispute that. But it is constrained by the taking clause applying the three standards of Penn Central, and it's constrained by equal protection principles that it has to legislate based on relevant differences. And our point is that it's fundamentally unfair to people who had played by the city's rules since 1937, had bought into the medallion system, had operated what was essentially a regulated utility where the city dictated everything it could do, unlike Milwaukee, which made the point that they did not participate. Milwaukee's council, who we just heard, acknowledged Milwaukee did not participate. It wasn't benefiting. It wasn't selling medallions. The city proposed to sell $18 million of medallions in October of 2013 and would have done so had not the market crashed due to the city abolishing the exclusivity it had granted to taxis. So our clients say that they, and I don't just say, it's a fact, the city doesn't dispute this. They made very large investments. They staked their livelihood on the stability of the city's medallion system, and then the city radically changed their system. But then, of course, that's what competition does. Wipes out entire industries. Something new comes along, and the old goes down the drain. It isn't new, Judge Posner. That's good. It isn't new. Of course it's good. I didn't say good. It's not new. Where would you be in the 18th century now, right? I am talking about Uber and taxis. Uber is a subset of taxis. Uber is an innovative transportation method. I respectfully disagree. It ought to be allowed to flourish.  It's the same as what used to be known as gypsy taxis. All right, so what does Uber have to do, in your view, to survive in Chicago? That's not my problem. It's not my problem to set transportation policy. I'm asking you a question. You say you can't answer it. The answer is that the city can set transportation policy for everybody who is, in relevant respects, alike. And as long as those rules are rationally related to any imaginable, plausible government purpose, they're sustained. So I understand you say you want to leave it up to the city, but you asked for preliminary injunction relief. So we need some idea of what you want the city to do in a preliminary injunction requiring taxis and TNPs to be treated the same. Would you have the city to say that TNP drivers have to get medallions? Would they have to get the same type of insurance or have the same thing in terms of people with disabilities or some of those other differences that you point? What would you really want in the injunctive relief the city to do other than just saying we're going to leave it up to the city? Equal treatment in six areas. Driver licensing, vehicle age and inspection, wheelchair accessible vehicle requirements, annual license fees or semi-annual license fees. Why should I get that? You want to have variety in services. You don't want everything the same. Do you? I guess I don't understand your question. I don't see Uber as a different form of transportation. Of course Uber is different. The only difference is it's not even different. You can summon a taxi as Mr. Feldman, my partner, and I did a little study in preparation for today's argument. We took his Uber app and we took his taxi app last week and we went and summoned an Uber and then we summoned a taxi to drive us from one end of LaSalle Street to the other. The two systems are absolutely identical. Uber has an app. The taxis have apps. There's no difference between them. Well, the taxis also have the ability to pick up people on the street, right? They do. And Uber and Lyft don't have that ability. And we want to be clear. We're not saying that that's not a relevant difference. And we're not saying that as to specific regulatory requirements, such as the requirement that you have a taxi meter fare, that's a legitimate, rational government purpose. We're not saying you have to abolish that because there are street areas. So it would be okay for Uber to pick up people on the street the way the conventional taxis do? If the city changes the law and if they treat Uber and taxis alike with regard to street hails, that would be a rational decision they could make. But they haven't made that. Well, what's the rationality of not allowing Uber to pick up people on the street? I don't know. You don't know? That's the city's judgment. We're not here to say that we should set transportation policy for the city on our equal protection claim and on our preliminary injunction request. We're saying in the six areas we identified in our preliminary injunction, there is no substantial, meaningful, equal protection difference, rational basis difference, between Uber or Lyft on the one hand and taxis on the other. Why can't a city rationally believe that it should regulate vehicles differently and protect citizens a little more when the person has no prior information about the car, the driver, like when it's a hail on the street, versus having an automatic, electronic record, a photo of the person and the license plates under the Uber-Lyft system? The distinction you describe doesn't exist in the real world. You have a taxi app system that provides all the same information. That's if you use the app. That's correct. So now, not a surprise, taxi companies now have an app, just like Uber and Lyft have an app. Actually, they had them before. They had it before, but I don't know how popular it was before, certainly when Uber and Lyft got in the game and became probably more popular. But there's also the ability for the taxi to, there's the hail method of getting, and so when it's that method, certainly when you get in the car, you can see the driver's name, you can see the medallion number, but it's not electronically registered that you as an individual are using that particular cab under the hail system, right? It is true that when you enter the cab, there is no electronic record made of your identity, but the cabs all now are required to have GPS, so they all are actually recording the location of the trip, just as the Uber app does. That's something the city's required of the taxis now for some time. So there's no substantive difference between the tracking and the notion that there is a significant pre-knowledge. When I summon someone with an Uber app, all I know is the license number of the car and the name of the driver. There are 20,000 at least, and maybe 90,000, according to the mayor, in August, 90,000 people driving. That tells you nothing meaningful, nothing that's any different than what you know when you open the taxi door, see the picture of the taxi driver on the city plaque, and see the face of the taxi driver. There's no significant rational basis difference between the two, because there's nothing you can do. This isn't a town of 300 people where there are six people driving taxis. There is no meaningful knowledge different than the knowledge you gain when you enter the taxi that you obtain by looking at the app. So our point is not that street hail is irrelevant, and not that street hail doesn't justify some difference in regulations, such as the requirement that you use the taxi meter, but our point is it doesn't just justify different driver licensing requirements. So you're saying, in effect, any time a company wants to produce a new product competing with existing products, it ought to get the government's permission? It's not a new product. Pardon? It's not a new product. But that's what you think. I do say that. Businesses shouldn't be allowed to start up without getting the government's permission, because, after all, a new business is bound to hurt existing businesses. I don't adhere to your view of that. You don't think so? It's not my understanding of what we're talking about. Well, then what's the difference between that and Uber coming along and offering a new service? Uber is not a new service. It's a taxi. It's a taxi someone's buying. Sure. That's like saying any time a company comes along with a new ice cream or something like that, there's nothing new because there's already ice cream. Now, there are actually maybe some differences with the new ice cream, but clearly differences between Uber and a conventional taxi. That is not what the taxi commissioner thought of the city of Chicago before the mayor fired her. When Uber first appeared in 2012 and 2013, she said, don't ride these things. They're just unlicensed taxis. We put that in our complaint, and we attached her tweets because that's how she chose to communicate this view to the public. We attached those to the complaint. So the city itself, the city's chief taxi regulator before the mayor wasn't there. So you can see every company saying that. A new product comes along. They say, oh, this is identical to what we do. So this should be enjoined, right? Every new service. Don't you think there's nothing new about Uber? No, it's the old gypsy taxi married to a phone app. That's ridiculous what you're saying. So let me ask you this, Mr. Schechtman. If the city for some reason wanted to end the medallion requirement for taxis, could it do that without violating your client's constitutional rights? Or suppose the city decided that going forward taxi owners did not need to buy medallions. Would that be okay? It depends on which right we're talking about. The city can change the medallion system, but then you've got to apply the three Penn Central standards. And if it abolishes it completely or radically increases the number of medallions, there is a taking that occurs under the three standards of Penn Central. As to equal protection, it's a separate analysis. Is it treating, in the same relevant respects, is it treating taxis and whatever the other entity is called, TNPs for now, in a rationally related manner for any differences that exist between them? So we say that as to the taking issue, it's governed by the taking standards in Penn Central. As to the regulatory standards, those are governed by the rational purpose analysis. We usually let consumers decide which product they prefer, unless there's some danger of poisoning or something. We don't say, oh, consumers, you shouldn't be buying this new product. It's really just like the old product. No one says they shouldn't buy it. The question is what regulations apply and whether equal regulation should apply in areas where there's no meaningful difference. between Uber and a taxi. But of course, there wouldn't be Uber unless there were consumers who saw a difference, right? There's no question that taxis have lost business to Uber. Right. And there is no question that one reason they've lost business is because the city allows Uber to charge whatever it wants and nails the taxi industry to the city-defined fares. So if we want to talk about competition, I view our position as pro-competition. Because what we're saying is give the taxis a chance to compete fairly. Don't tell them that they must follow the taxi meter rate and then let Uber surge price when it's convenient. So what you are urging is the deregulation of taxis? My point is… Which is fine with me, but is that your position? You want to deregulate taxis so they can do everything Uber does? Is that your argument? That's a policy judgment for the city. Is that your argument? Do you want to deregulate taxis? Is that what this case is about? It's not a yes or no answer, Judge. I can't answer that yes or no because… No, I want you to answer it yes or no. Are you urging the deregulation of taxis? That's a call for the city. If it doesn't… I'm asking you whether you believe, whether you're urging deregulation of taxis. Would the deregulation of taxis satisfy you by giving them parity with Uber? As long as the city… Yes or no. Just yes or no. It's not a yes or no question, Judge. Yes or no. You'll have to find another advocate for that answer. It can't be answered yes or no. That's ridiculous it can't be answered. Well, it can't be answered because it depends… Taxis could be deregulated. And my question is, is that what you want? Deregulated taxis. We want equal treatment. Do you want deregulated taxis, yes or no? It's up to the city. If it chooses its policy… You won't answer my question. Well, then I apologize. Well, you should answer it. It's not a yes or no question. The reason it's not a yes or no question, and I don't mean to be disrespectful or… I don't care about respect, but I like to have my questions answered. And I asked you a straightforward question. Do you want to see taxis deregulated so that they will be on a par, so far as, you know, techniques for luring passengers as Uber? I would like to see them get equal treatment. I don't see a yes or no. Equal treatment is what we're talking about. So you want to see the taxis deregulated. The city can go either way. It can raise Uber as a judgment. Raise Uber? Raise Uber's driver standards. What do you mean by raise Uber? It can say to Uber, you need a chauffeur's license. Or it can say to all taxis, you don't need a chauffeur's license. And which do you prefer? I think the taxi industry would greatly prefer the latter, to be free of the chauffeur license, because due to the fact that Uber has now taken a large portion of the taxi business, they can't recruit drivers who have chauffeur's licenses. Taxis are sitting idle for that reason. Okay, well, that's a good project for you. Get the city to deregulate taxis. Then you're happy. Then you'll be happy. Well, I would be happy if they applied the same rules to both. That's their judgment. The city's legislative judgment. But what it can't do, we say, is have a chauffeur's license for taxis and basically a private driver's license for Uber. It can't have metered fares, which cannot be changed for taxis, and anything goes for Uber, both because it's unfair. It's just destroying the taxi industry, and because there's no rational basis that you can conceive of for those differences. Okay. Well, thank you, Mr. Schacht. You are welcome. So, Ms. Lacy? May I please record? Your Honors, the plaintiffs have asserted four constitutional and three state law claims in an effort to challenge the city's power to authorize TNPs to operate in Chicago. Five of these claims share the common requirement for a plaintiff to show a source in local law. These TNPs, is this just Uber and Lyft, or is there something else? There's also Sidecar, and those are the three that are alleged in the complaint. There may be others as well. It's a generic term, Your Honor. And you focused a lot on the street hails, and now there's a taxi app like the Uber app and the Lyft app. And so why doesn't the ability to summons by smartphone effectively eliminate the distinctiveness of the street hail? Yes, Your Honor. You know, what's the big difference between hailing? So now we know with taxis, you can, with the app, identical. You would agree that's identical. They both are able to be hailed by app. That's correct, Your Honor. Right, the Uber, Lyft, and taxis. That's correct. So the only real bottom line is this hailing. And so you're saying that that's different than, I mean, isn't it just using the phone rather than your arm? No, Your Honor. There are differences between the ability. When a taxi company can stop on the spur of the moment, they stop before the customer has had the opportunity to opt in to the set of contract terms that they must opt into when they press the smartphone and choose to reserve an Uber. Those features work in combination. The street hail is an instant, of course, a body of regulation has sprung up around the fact that there are strangers flagging down four hire vehicles on the street that are completely rational because before, of course, the advent of the technology, there was no other way to get the service other than to raise your arm and stop a strange car passing by. With the technological advances, now consumers are able to press a button on their phone, but before they can, the TMP vehicle will stop for them. They've already signed up in advance. They've agreed to a set of terms and conditions that regulate that transaction, and that is just not possible. Even if you hail a taxi by smartphone, you aren't opting into the background of the contract principles that govern the TMP ride. You're choosing a different form. You're choosing a government-based backstop, the city's regulations that sprung up around that particular form of hailing, but you have not had the ability to negotiate your terms ahead of time, and you don't have the information about the driver or the vehicle that gives you the opportunity to make informed choices like you can with the Uber model. So there's a salient difference that even the plaintiffs have admitted that the street hails are a relevant difference, justifying different treatment, and it is the plaintiff's burden in this equal protection challenge to not just explain what the burdens are on the taxis. Their grief and their argument focus almost exclusively on why it's costly and burdensome for them. They need to lay out the different treatment that the TMPs are operating under and then negate every conceivable rational basis for having different treatment. And in addition to the street hails and the ability to opt into contract terms that make it rational for different regulations, there are also real differences which the plaintiffs themselves have alleged between the various fleets. They say that there are 6,800 medallions and 20,000 TMP vehicles. They also say that the taxi vehicles are used more frequently in commercial service than the TMP driver using a personal vehicle. Those differences make it rational for the city to perhaps outsource inspection costs or put the onus on the TMP to perform some of the background check or the training. So the regulatory differences follow from these differences between the business models, and it's rational for the city to choose that different set, and plaintiffs did not succeed in their burden to negate those rational bases. But the plaintiffs say that many taxi rules apply to TMPs in New York City and TMPs flourish. Why doesn't that show that equal rules in things like driver's licensing, insurance, and vehicle standards wouldn't be fatal to TMPs and to consumer choice? Well, Your Honor, it's not a question on the Equal Protection Review whether there could be a better system. Perhaps there could be. Perhaps Chicago will regulate differently in the future. But the question on their equal protection claim is whether there is no conceivable rational basis for the city to choose this different form of regulation. And the plaintiffs had the burden to show that it was absolutely irrational for the city to choose a different regulation. So even if New York regulates differently and New York regulates successfully in that different manner, that does not make Chicago's choices irrational because this court, of course, does not decide what is the best policy. The court decides equal protection. Was there any rational basis for the difference in treatment? I just want to clarify, on the taxi app, you're saying all those contract conditions don't exist. That just brings the taxi to you because the price hasn't been set and agreed to and the credit card isn't on file. I mean, it's my understanding. I don't know exactly what the taxi app calls up when you say it, but I do know that when you call up the taxi through the app, you are opting into the set of the government regulation that already exists. Now there are some differences, for example, in the pricing. The ordinance permits taxis that are hailed by smartphone to do some surge pricing, just like it permits TMPs that are hailed by smartphone to do some surge pricing. So there have been changes, but there is still that backstop of government regulation. You're still getting a taxi who's specially marked, who's got the taxi meter, and you don't have the same opportunity to opt into the ability that the TMP is going to be the one who's checking the driver's background or what the insurance requirements are going to be for the TMP driver or any other of those terms that they've alleged are very different. The terms of service that govern the TMP relationship are not going to be there. It's going to be the backstop of the government regulation when you hail by smartphone a taxi. So because plaintiffs fail to negative every conceivable rational basis for the different treatment, we submit that the district court should have dismissed count three. Count three and count two are the equal protection claims. Those are the city's 1292B appeal from the district court's denial of our motion to dismiss. The other equal protection count, which is count two, it appears the plaintiffs have narrowed the focus of that to challenge just the mayor's failure to enforce against TMPs the specific ordinance prohibition on operating without a taxi or a PPV license. Now, that provision is not applicable to taxis because, of course, they have taxi licenses. So they're not subject to prosecution under that prohibition either. And so accordingly, this is not alleging a difference in treatment that would give rise to an equal protection claim. They are treated exactly the same as the TMPs are with respect to that ordinance provision because it doesn't apply to them. Well, and in addition, you can't get that form of equal protection relief, as I understand the law, on the basis that the city didn't prosecute somebody else. Absolutely, Your Honor. Or didn't pursue a regulatory enforcement action against somebody else. Absolutely, Your Honor. It doesn't state an equal protection claim. And for that same reason, it doesn't state a substantive due process claim, which is count four of their complaint. Castle Rock, the Supreme Court's decision, holds that there is no protected property interest in enforcement of the law against someone else. And that's for substantive due process purposes. But for equal protection purposes, the same principle applies. It's not alleging a difference in treatment. It's just alleging that the government did not do something to someone else. It's not something that the government should have been doing to the taxis and the PPVs. So it's not a difference in treatment. And if they were alleging any kind of differential treatment, they would have to show invidiousness to state a selective prosecution claim. And for that reason as well, there's simply no equal protection theory that's applicable to that sort of allegation. So for that reason, count two should have been dismissed as well. So let me ask you this. So part of all the various regulations the cities have, the underlying premise is it's to protect citizens, right? To make sure it's a safe vehicle, that the person knows how to actually drive and knows what the rules are, things like that. Well, there are certainly, yes. Those are among our interests. So I'm just trying to understand the city's interest as it relates to these TMPs, because it doesn't seem like there's a similar concern for safety since they're not those same regulations on TMPs. Well, Your Honor, there is similar concerns about safety. It's just a different way of making sure that those concerns are satisfied. The regulations for the taxis have the city doing a lot of the background checking and doing a lot of the training. The TMP regulations are requiring the TMP companies to be the ones doing the training, to checking the background. And the city has no interest in making sure the TMPs actually do that? No, we do. Are they getting reports and things from the TMPs? The new amendments do require reports or allow the city to audit the TMPs' performance of these background checks, but this gets back to the plaintiff's burden. They didn't actually fully set out for this court the different way that the TMPs' regulations handle these concerns, and therefore they failed to meet their burden to negative the conceivable rational basis. We use the example of the wheelchairs in our reply brief because they just talk about how it's expensive for them to purchase these vehicles, but the city's regulations do require the TMPs to serve disabled consumers too. They just do it in a different way because the smartphone technology allows you to connect the customer with a driver who's equipped to handle them. It's just a different manner of satisfying the need. There's any number of ways the city could regulate, just as the New York example shows. We could choose to regulate like New York too. It's not irrational, though, to have a different way of doing it. The takings, that claim fails just for the same reasons as the other ones. There's no clear entitlement in local law. They would need to be able to show a promise, not just the medallion, but the promise that the city would never add additional for hire vehicles in the market, or we'd never amend the chapter to authorize new forms of for hire transportation, and that's simply not in there. The language of the ordinance says, subject to conditions and limitations of this chapter, the city grants exclusive permission to operate the taxicab vehicles licensed here under. That cannot be interpreted as a promise that we would never amend the conditions and limitations of the chapter to authorize for hire vehicles. Exclusivity is specific to that license? I'm sorry, Your Honor? Exclusivity is specific to that license? The exclusivity regarding the taxi service. The exclusive permission and authority is to the licensees to operate the taxicab vehicles. Right. The plaintiffs want that exclusivity language read to mean a protected property interest in the right to exclude competitors operating under a different business model. Right, and that language is not in there. In fact, that grant is subject to conditions and limitations of the chapter one of those limitations in the chapter is in subsection A, which they admit lists PPV vehicles, which are for hire vehicles. So really they would need a promise that the city wouldn't amend A to add TMP vehicles. That's exactly what the city did when it authorized TMP vehicles. It added to that subsection A TMP vehicles in addition to the PPVs and the taxis. And this language, subject to conditions and limitations of the chapter, the city grants permission to operate taxicab vehicles, doesn't promise not to amend the chapter. And, of course, there's a presumption that cities are free to amend legislative enactments. So I see my time is up unless there are other questions. We respectfully ask that the court affirm the judgment on taking substantive due process, the state law claims, and the preliminary injunction, and to reverse the judgment on the equal protection claims and order counts two and three dismissed. Okay. Thank you, Miss. Thank you, Your Honor. Mr. Oh, I'm sorry. Sorry, Mr. Sanders. I'm sorry. I shouldn't have forgotten you, Mr. Sanders. May it please the court. Yes. Sorry to have me again, but I will be brief. Again, there is no such thing as a deregulatory taking. In addressing the takings claim in this case, appellant's counsel discussed that the Penn Central test, there's no need to even get to the Penn Central test. Penn Central only applies if there's a property interest. And, again, there is no property interest in excluding someone else from the market.  I'm going to talk about the city of Chicago, which was launched in 1984 when the landmark taxi survey came out. Has the FTC been asking the city of Chicago and other cities to violate the fifth amendment for the last three decades? No, they've been asking them to catch up with the times. They get better transportation policy, and that's what the city is finally doing now. On the equal protection question, no one is actually asking to be treated equally in this case. If the taxicabs wanted to be treated equally, they would be asking to lift the taxicab cap. So more taxicabs can enter the market and compete against these 20,000 or so Uber and Lyft vehicles. But they're not doing that, obviously. And why do they need to assert that argument in order to win? They don't need to. Does it have to be lifted?  But on the equal protection question, of course, there's a public policy component of issuing a preliminary injunction. And so the better public policy for them to ask for, if they're asking to be treated equally, would also be to ask to lift the cap. Now, of course, they're not asking to lift the cap because they have the takings claim and other claims that are premised on the cap. And briefly, the issue of New York regulations came up. New York, as we cite in our brief, is currently being sued in a very similar litigation to this litigation. The complaint in that case, which we also cite, is very similar to the complaint in this case. So I think if you ask New York taxi drivers about Uber, everyone isn't getting along, just as may have been alleged here. So with that, if there's no further questions, I'll yield it to appellant's counsel. Thank you. Thank you, Mr. Sanders. Mr. Shackman? In order that we not leave unresponded no property interest, there's an Illinois appellate court decision, Boonstra, which we cite that squarely holds that taxi medallions, Chicago taxi medallions, are property. And in that case, the refusal to transfer the medallion was taking the property. So the argument you just heard, that there's no property interest in medallions, is contrary to Illinois law, and it's Illinois law for taking purposes that establishes what is property. Well, the material question is whether there's a property interest in excluding competitors. There is, and I agree that is the case. And that's not what the Boonstra case upholds. Boonstra deals with the transfer of medallions. But the only reason the transfer of medallions was valuable is because it permitted you to operate a taxi. And coming back to Judge Sykes, to your question about what the ordinance says, I would address your attention to page 32 of our reply brief, where we not only quote the chapter, the section that counsel for the city read, but if you drop down to subsection C of that section, you see that it says, it shall be unlawful, this is the city ordinance, it shall be unlawful for any taxi cab or public passenger vehicle not licensed as such by the city to solicit or accept business within the corporate boundaries of the city of Chicago. So it's not just saying that it's the license that gives exclusivity. It is saying that anyone who does what a taxi cab does, and this is our argument, I know Judge Posner and I disagree on this, but our argument is that these vehicles, the Ubers and others, are doing exactly what taxi cabs do, and they are therefore doing it and fall under that subsection C. Well, it's not exactly the same. That's not accurate. I apologize for misstating your position. And in terms of the regulations for T&Ps, counsel talked about the regulations being essentially, I mean she didn't say each one was parallel in terms of requirements for taxi drivers, but did you fail to carry your burden because you have not specifically identified the regulations for T&P? We identify them all. Unless I just, you know, where is that in your brief? It's in our initial brief where we identify the different standards, and it's in our description of the preliminary judgment. Well, I know all the different standards, but I mean just in terms of how the city regulates the T&P scheme. We discuss them all. For example, T&Ps do not have to be fingerprinted to be a driver. Taxi drivers do have to. There's no rational basis that the city has yet suggested for fingerprinting one and not the other. The fact that one is summoned by a cell phone has nothing whatever to do. Why do you think Uber is popular? It's cheaper, and it appeals to people who like to use it. That sounds good, cheaper. I'm sorry? That sounds good, cheaper. Then let the city allow taxis to compete with them. There's no equal protection rational justification for chaining the taxis to the taxi meter and letting their competitors undercut them. That's a component of our equal protection claim. Competitors often undercut each other. That's what competition is about. Yes, but is it about government restraining one competitor? No, I don't think so. That's what they're doing to the taxi industry. That's what they're doing at the airports where they're giving a horrendous advantage to the T&Ps to get to the customer faster, and they're requiring the taxis and liveries that are prearranged. So you say because of city regulations, the taxi cabs are handicapped in their ability to compete? Is that your argument? They're dying, Judge. Their business is down 45% and 50%. What is killing them? The inability to compete because they are chained to city fare regulations. They have to have city-licensed chauffeurs. Uber doesn't. They can't get to the passengers as quickly, and that makes a big difference at the airport because Uber gets the upper level. In each of the areas we identify... Why can't they get to the airport as quickly? Uber is allowed to pick up people who have prearranged on the top level. Taxis can only pick them up on the bottom level. The difference in access is the difference between 5 minutes, according to our affidavits, our declarations, and 40 minutes. So why aren't you pushing for relaxation of regulatory limits on taxi cabs? That is a solution that would address the equal protection claims we're making. And what we've said in our request for a preliminary injunction is the city can set the standard, but it's got to be applied equally where there's no rational basis for a different treatment. What's the rational basis for different insurance requirements? What's the rational basis for fingerprinting for one and not for other? What's the rational basis for a chauffeur's license that requires four weeks of schooling for one and no chauffeur's license and you can sign up and be driving overnight? So you want basically deregulation of the tax? We want equal treatment, Judge. We want equal treatment in our equal protection claim, and that's the core of the equal protection claim. Going to a couple other arguments that were just made, I'd like to respond quickly. You'll be happy either having taxis deregulated or Uber more regulated just the way the taxis are. Either one is fine with you? That is our position, where there's no basis to distinguish between the two. One, of course, is bad for consumers, right? It's up to the city to determine what rates to set, but it can't set separate rates for what are basically the same product, and that's what it's doing. It's allowing Uber to set any rate it wants, and it's telling the taxis you must follow the taxis. So your bottom line on the equal protection claim is, given the differences between the taxis and the TMPs and your position that there's really no rational basis, since we're at the 12B6 stage, you should be able to be given the opportunity to provide more evidence on this point and to make your point, such as the point about upstairs being able to hail, which is the departure area, which is typically not as crowded as the lower level of arrival, and that you should be able to attack the city's rational basis for those various distinctions. We think there is no rational basis for saying that taxis that are prearranged and liveries that are prearranged have to go into a 40-minute queue and TMPs can be able to pick up their passengers in five minutes. May I take another minute, or am I out of time? No, I'm afraid we'll have to move on. Thank you for your patience. Thank you very much to all counsel.